IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

FILED
99 MAR 31 PM 4:44
U.S. DISTRICT COURT
N.D. OF ALABAMA

| | | |
|---|---|---|
| MONICA Y. AGEE, | ) | |
| | ) | |
| Plaintiff, | ) | **ENTERED** |
| | ) | |
| vs. | ) | CIVIL ACTION NUMBER  **MAR 3 1 1999** |
| | ) | |
| JEFFERSON COUNTY PERSONNEL BOARD, et al., | ) | 93-C-0397-S |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OF OPINION**

Plaintiff, Monica Agee-Kimbrough, complains in this case that she was discriminated against by the Jefferson County (Alabama) Personnel Board ("JCPB") and John Seaman because of her race and sex; and that in retaliation for her having filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"), she was suspended for fourteen days and subsequently discharged. Based on the Findings of Fact and Conclusion of Law which follow, the Court finds that although the plaintiff has carried her burden of proof of retaliation under 42 U.S.C. § 2000e et seq. ("Title VII")[1], the case must be dismissed based on the

---

[1] The court finds it generally unnecessary to reach plaintiff's claims under 42 U.S.C. §§ 1981 and 1983. To the extent that the plaintiff claims due process infirmities in the hearing which resulted in her termination, such claims are precluded by McKinney v. Pate, 20 F.3d 1550 (11th Cir. 1994).

Full Faith and Credit Clause of the United States Constitution.

I.

The plaintiff is a black female citizen. She was employed by JCPB in its Testing Division as a Personnel Analyst I[2] from April 9, 1991, until July 23, 1993.

Plaintiff was well-qualified for her position. With a baccalaureate degree in statistics, plaintiff was the best-qualified applicant for the position.

Defendant John Seaman is the Chief of the Testing Division. Dianne Clark is the Director of JCPB; and Ben Payton is its Deputy Director.

Plaintiff's first year of employment was served in a probationary mode. At the end of her first six months, she received an overall grade of 86.4. Seaman wrote that her "...job performance over the past six months has been quite good." Court Exhibit ("CX") 1, ¶ 23. She received several compliments concerning the high quality of her work.

---

[2] Two of the major job responsibilities for the position of Personnel Analyst I are to research and recommend minimum qualifications standards for all new and existing positions under the Jefferson County merit system and to assist in developing a mechanism for validating the minimum requirements. CX 1, ¶ 42.

Around the same time that plaintiff commenced her employment with JCPB, she started dating Sandy Lee, a deputy sheriff of Jefferson County. In October 1991, plaintiff learned that she was pregnant with Sandy Lee's child. By that time, Sandy Lee had terminated the relationship. The predictable tensions, frustrations, and confrontations ensued - both within and outside the Jefferson County Courthouse, where both plaintiff and Sandy Lee worked.

When Seaman learned of plaintiff's status, his known disparagment of pregnant women was ignited. In the next few months, his entire relationship with plaintiff changed. On the day of the company Christmas party, he remarked to plaintiff that he was "...going to have to get a day care center around here." Trial Transcript ("TR"), p. 41. On one occasion, he inquired of plaintiff the reason why she, with two children already, wanted yet an additional one. On another occasion, as plaintiff walked past his office, he pointed at her stomach and asked, "What's going on under your dress?" TR. 43.

More importantly, Seaman's new attitude towards plaintiff was reflected in his closer scrutiny of her work. On January 12,

3

1992, Seaman caused a 6-page, single-spaced memorandum of a counseling session with plaintiff to be placed in her file. Seaman was not really concerned about plaintiff's job performance, "[r]ather, it was her responses to [his] comments that were most troubling." Plaintiff Exhibit ("PX") 12. Seaman never documented a counseling session with any other probationary employee.

On April 3, 1992, plaintiff was suspended for seven days without pay by Director Clark on Seaman's recommendation. The suspension was ostensibly based on plaintiff's asserted "inability to handle the interpersonal demands of her job." PX 13. It was also predicated on the January 12 memo. *Id*, p. 2, ¶ b. Plaintiff convincingly responded to the charges at considerable length, (PX 140), but the suspension was upheld by the JCPB.

Plaintiff's probationary period ended on April 9, 1992. At any time prior to that date, JCPB could have terminated her employment without a right of appeal on her part. She was not terminated during her probationary period because, notwithstanding her ostensible problems with interpersonal relationships, and the documented "counseling session," her overall performance was quite satisfactory.

4

On the day after she achieved permanent status, plaintiff filed with the EEOC a charge of discrimination against JCPB, alleging that the seven-day suspension was based on her race, sex, and pregnancy. Although plaintiff disclosed to her supervisor that she had filed the charge within a day or so after the fact, JCPB did not receive the formal charge until April 21, 1992.

On April 13, by which time Seaman was informally aware of plaintiff's EEOC charge, she received her first annual performance evaluation. She was given an overall rating of 76.9, which is within the range of acceptable performance. In violation of PBR 8.3, Seaman did not discuss this evaluation with the plaintiff until requested to do so by Director Clark. PX 20, 21.

Plaintiff's October 1992 performance evaluation was slightly lower (75.7) than her April rating. PX 25. Seaman commented:

> While it is my opinion that you have made some gains in your performance over the past six months in the Division, I also find that you are periodically prone to instances of counterproductive work behavior....
>
> In summarizing your performance over the past six months, I would have to say that your performance has been acceptable for the most part, but that you have continued to have

5

>occasions where you exhibit an inability to accept authority and responsibility for your actions....
>
>I continue to believe that you are a capable individual, and some of your efforts I have witnessed would not suggest otherwise. The best thing you can do for yourself is to continue to work hard, and to accept responsibility when it has been determined that an error has been made at "your watch." Errors are going to be made, we're going to learn from them, and then we're going to move on. You are capable of doing the work we perform quite well, and I expect that in addition to acknowledging your good achievements, you will come to acknowledge those aspects of your performance where improvements can be made.

PX 24.

This lawsuit was filed on February 26, 1993.

Two months after the filing of this action, Seaman gave to plaintiff an unsatisfactory performance evaluation. Her overall rating was 64, which disqualified her from a merit wage increase. Seaman's notes accompanying the evaluation set out six instances of "particularly poor performance" and one instance of "particularly good performance" during the evaluation period. Five of the six articulated instances of alleged unsatisfactory performance occurred since the filing of this action; all occurred within the

6

last six weeks of the 6-months rating period.³  The unsatisfactory rating was in significant part motivated by retaliatory animus on the part of Seaman.

The April 1993 evaluation was accompanied by Seaman's written warning that if plaintiff's "disruptive behavior and errors continue" he would recommend severe disciplinary action.  He also indicated that plaintiff's performance would "...be reviewed in 30 days in order to make a determination of any further action deemed necessary."  DX 9.

Only three other JCPB employees have been disciplined - and an attendance problem was involved in each of them.  TR 327.

On June 17, 1993, plaintiff was again suspended - this time for fourteen (14) days.  This suspension was based ostensibly on the plaintiff's failure to properly evaluate candidates; but Clark testified that the real reason was plaintiff's opinions and attitude as expressed in a letter to Clark.  TR 364.

---

³ They include (1) lateness for a role-playing session on the day that this lawsuit was filed, (2) a dispute between plaintiff and her supervisor, (3) plaintiff's failure to properly videotape a candidate's behavioral performance, (4) plaintiff's fabrication of an unsubstantiated rumor concerning the discharge of a probationary employee, (5) plaintiff's interruption of a meeting between Seaman and her supervisor, and (6) a memo of plaintiff to Director Clark in which she accuses Seaman of subjecting her to "unusual scrutiny" in retaliation for her having filed a complaint against him.  Defendant Exhibit ("DX") 9.

7

The court finds that the 14-day suspension was a pretext for retaliation against plaintiff for the filing of EEOC charges and this lawsuit. The suspension was upheld by the Personnel Board. PX 18.

## II.

Plaintiff was 8 ½ months pregnant with Sandy Lee's child, when in June 1992, Sandy Lee married Loretta Taylor, a nurse at the University of Alabama ("UAB"). Plaintiff's love for Sandy Lee was unabated. She made many harassing calls to Sandy and his new wife, both at home and on their respective jobs. She also telephoned Sandy Lee's parents and his supervisor at the Jefferson County Sheriff's Department.

Sandy Lee falsely denied paternity of the child, which served only to exacerbate the plaintiff's feelings of frustration and hostility.[4]

In September 1992, after plaintiff had made a harassing call to Loretta Lee, she (Loretta) called Ben Paden in his capacity as plaintiff's supervisor. She told Paden about the harassing

---

[4] The hostility was not one-way. For example, Sandy Lee, who was in charge of warrants, swore out a warrant against plaintiff on a charge of criminal harassment, and caused plaintiff to be arrested on her job. At trial, plaintiff was found not guilty. TR. 359, 364.

8

calls to her job, and the "false claim" that her husband was the father of plaintiff's child. PX 53. Paden thereafter talked with plaintiff about the matter. Plaintiff confirmed that she had indeed made the calls to the Lees and Sandy Lee's parents and supervisors, but she consistently denied having made the calls during her work hours, except while on a lunch break.[5] Paden cautioned plaintiff not to make such calls from her office, and advised her that "she should obtain an attorney and go through the legal system...." *Id.* Paden promptly advised Seaman and Clark about this development. Clark knew from that point on that plaintiff was involved in a fairly stressful situation with the Lees. CX 1, ¶ 85.

The bitter exchanges between plaintiff and the Lees continued into 1993. Between November 1992 and early spring 1993, plaintiff had made three or four harassing calls to Loretta Lee. None of these calls were made during plaintiff's work hours.

In mid to late March 1993, Loretta Lee again called Paden and complained of plaintiff's harassing calls. Paden, Seaman, and Clark then realized that the Lees' complaints could be manipulated

---

[5] The parties agree that it is not a violation of any Personnel Board rules to make personal phone calls from work. CX 1, ¶ 81.

9

as a means of achieving their goal of effecting a retaliatory discharge of the plaintiff.

Paden volunteered to come to the Lee's home to investigate the matter, although it was improper to make such a visit prior to receipt of a formal complaint. TR 338. Mrs. Lee was "surprised" that he came to her home. TR 261. Paden brought with him an unidentified female, who tape-recorded the conversation. Paden took notes as Loretta Lee expressed her complaints about plaintiff.[6] From the very fact that Paden on his own came to her home for the interview, Loretta Lee properly surmised that the JCPB had a motive other than the processing of her complaint against plaintiff. TR 263, 264. Paden advised Loretta Lee to contact Clarie Haynes, the Personnel Manager, to obtain a copy of the rules governing citizen's complaints.

Clarie Haynes sent to Loretta Lee a letter enclosing a copy of JCPB's Rules covering the filing of citizen's complaints.[7]

---

[6] The tape and notes were destroyed by Paden. Had they been retained, they probably would have shown the nefarious nature of this extraordinary visit.

[7] The Rule reads simply:

**CITIZENS MAY FILE CHARGES**

Any person who desires to file charges against an employee shall file such

10

The letter also told Mrs. Lee the specific allegations which should be included in the complaint. PX 54.

The Lees filed with the Director of Personnel a citizen's complaint against plaintiff on or about May 24, 1993. This complaint was substantially the product of Paden's urging. After the complaint had been filed, Paden again went to Loretta Lee's home and talked with her.

Plaintiff denied the allegations of the Lees' complaint, and she specifically denied that she had made harassing calls while on her job.[8] PX 24.

A hearing on the Lees' citizen's complaint was set for July 12, 1993, after consultation with plaintiff. Haynes sent a

---

7/ Continued

> charges in writing and shall recite therein the specific act or acts of the employee constituting such cause. The Director shall serve a copy of the charges on the accused employee and shall fix a day for the hearing. The accused employee shall, within five (5) calendar days after service, file a written answer to the charges. Failure on the part of the accused employee to file such answer shall be deemed an admission of the truth of such charges without further investigation or hearing on the part of the Board. If the hearing is held before the Director, the testimony shall be recorded. A decision shall be rendered by the Board in accordance with Section 6.8 of this Rule.

[8] Plaintiff filed a citizen's complaint against Sandy Lee on June 4, 1993. PX 58. Clark dismissed the complaint on the ground that the alleged conduct occurred while Lee was off-duty. PX 64.

11

certified letter to plaintiff notifying her of the hearing, but the letter and notice were not received by plaintiff. However, plaintiff had actual knowledge of the date of the hearing before the abortive notice was sent. Although plaintiff was represented by counsel, counsel was not notified of the hearing by plaintiff or Haynes. On the morning of the hearing, Haynes hand-delivered to plaintiff a copy of the notice. Plaintiff was told that she could request a continuance, but she declined to do so and proceeded to the hearing without a lawyer.

The hearing proceeded before a Hearing Officer designated by the JCPB. At the commencement of the hearing, Haynes noted: "Ms. Kimbrough is representing herself in this case." DX 36, p. 6. Only two witnesses were sworn: plaintiff and Paden. DX 36, p. 2. The plaintiff generally denied that she had harassed the Lees while she was on-duty. She admitted that she had placed calls to the Lees during her lunch hour, which is not violative of JCPB policy. In her cross-examination of Paden, plaintiff raised the issue of retaliation based on her EEOC charges and this lawsuit. *Id.*, 60.

The Hearing Officer recommended that the citizen's complaint be sustained; and that plaintiff be discharged. DX 28. The Hearing Officer's report and recommendation were based in part

12

on the unsworn "testimony of Mr. and Mrs. Lee...." DX 28, p. 2. The JCPB sustained the Lees' charges, and discharged plaintiff as of July 23, 1993.

Loretta Lee was surprised that plaintiff was terminated as a result of their complaint. TR. 271. She never suggested to the JCPB that plaintiff be terminated. *Id.*

According to defendant Clark, the Lees' complaint was the only reason for plaintiff's discharge. TR. 34.

The court concludes that plaintiff's discharge was motivated in part by her filing of an EEOC charge and this lawsuit against the JCPB. To be sure, this was not the only reason; but retaliation was one of the reasons which led to her discharge.

### III.

Following her discharge by the JCPB, plaintiff appealed to the Jefferson County Circuit Court. DX 31. The Circuit Court, sitting effectively in appellate status, reviewed "...the transcript of the testimony of various witnesses who appeared and testified before the Hearing Officer...." <u>Kimbrough v. Jefferson County Personnel Bd</u>. (Jefferson County Circuit Court, CV 93-5992 Order of September 19, 1994). After hearing oral argument, the

Circuit Court found that there was "substantial and legal evidence" to support the JCPB decision, and so affirmed the decision. *Id.*

Plaintiff appealed the decision to the Alabama Court of Civil Appeals. It affirmed the Circuit Court. <u>Kimbrough v. Jefferson County Bd. of Personnel</u>, Court of Civil Appeals of Alabama, Special Term 1994, AV 93-000554.00, Order of July 28, 1994.

Plaintiff also appealed her 14-day suspension to the Jefferson County Circuit Court. <u>Agee v. Personnel Bd. of Jefferson County</u>, (Jefferson County Circuit Court, CV 93-7546). The JCPB decision was likewise affirmed by that court.

## Discussion

The United States Supreme Court in <u>Kremer v. Chemical Construction Corp.</u>, 456 U.S. 461 (1982) held that the Full Faith and Credit Clause of the Constitution, codified at 28 U.S.C. § 1738, requires a federal court to give the same preclusive effect to a state court judgment as the state itself would give to the judgment. A state court affirmance of a state administrative ruling is entitled to <u>res judicata</u> and collateral estoppel effect in a subsequent federal civil rights action, if the party litigated

the claim in the prior state court proceeding. <u>Casines v. Murcheck</u>, 766 F.2d 1494, 1499 n.9 (11th Cir. 1985); <u>Gorin v. Osborne</u>, 756 F.2d 834 (11th Cir. 1985).

Under Alabama law, res judicata applies to issues that could have been litigated. <u>ABC Truck Lines v. Kenemer</u>, 25 So.2d 511 (1946). Where a personnel board has made a decision, the circuit court on appeal by an aggrieved employee, may review whether evidence supports the findings of the board and whether the board has made errors of law. <u>Sykes v. McDowell</u>, 786 F.2d 1098, 1102 (11th Cir. 1986) citing <u>Phelps v. Public Comm'</u>, 46 Ala.App. 13, 237 So.2d 499 (1970)); <u>Baker v. Denniston-Boykin Co</u>., 245 Ala. 407, 17 So.2d 148 (1944).

JCPB Rule 6.13 provides that a party may appeal to the Circuit Court "to review questions of law and the question of whether or not the decision or order of the Board is supported by substantial and legal evidence."

The doctrine of <u>res judicata</u> applies under Alabama law where (1) there is a prior judgment rendered by a court of competent jurisdiction; (2) there is a prior judgment rendered on the merits; (3) parties to both suits are substantially identical;

and (4) the same cause of action is present in both suits. Dominex, Inc. v. Key, 456 So.2d 1047, 1054 (quoting Wheeler v. First Alabama Bank of Birmingham, 364 So.2d 1190, 1199 (Ala.1978), aff'd 385 So.2d 47 (Ala.1980)).

Insofar as the doctrines of res judicata and collateral estoppel are incorporated in § 1738's Full Faith and Credit obligations, they are jurisdictional and not subject to waiver. Doyle v. Jefferson County, (unpublished opinion, CV-91-P-403-S, N.D.Ala., decided April 24, 1994), aff'd, 135 F.3d 144 (Table).

Under Kremer, the circuit court judgment affirming plaintiff's suspension and discharge are entitled to preclusive effect.

Plaintiff argues that she has not had a full and fair opportunity to litigate her claims in state court. The argument has considerable merit - for there was no hearing on the 14-day suspension (though plaintiff was adequately notified of the asserted basis of the suspension and she fully responded to the charges), and plaintiff was not fully apprised that the Lees' citizen's complaint could result in her discharge. But plaintiff had a choice of whether to appeal the decisions to state court or

pursue her remedies in federal court. After all, this case had already been filed by the most experienced Title VII plaintiffs' law firm in this area of the country. She elected not to make a choice but rather to pursue both paths simultaneously.

Neither of the cases relied on by plaintiff, <u>Thornquest v. King</u>, 61 F.3d 837 (11th Cir. 1995), nor <u>Sykes v. McDowell</u>, 786 F.2d 1098, extricates her from the devastating impact of the Full Faith and Credit Clause.

<u>Thornquest</u> involves a decision made by the same Board of Trustees which fired the plaintiff. Finding that the plaintiff's claims were against the Board itself, and that the Board lacked competence to determine legal issues, the Eleventh Circuit held that the Full Faith and Credit Clause did not bar the federal action. Plaintiff's position differs in these respects: (1) her suspension and discharge decisions were affirmed by a state court of competent jurisdiction, (2) there is no showing of bias on the part of the individual members of JCPB, unlike the apparent bias of the trustees in <u>Thornquest</u>, and (3) the Alabama circuit court is empowered to determine both legal and factual issues, while the <u>Thornquest</u> Board of Trustees were not empowered to determine legal issues.

In <u>Sykes</u>, the state court judgment addressed the procedural posture rather than the merits of the constitutional claim; the parties were not substantially identical; and the Eleventh Circuit was "not persuaded that under Alabama law, the two cases involve[d] the same cause of action." 786 F.2d at 1102. Under the <u>Sykes</u> circumstances, the doctrine of <u>res judicata</u> is simply inapposite. The <u>Sykes</u> court noted that "federal courts must accord preclusive effect to issues litigated and decided on the merits." *Id.* at 1103.

This case is much akin to <u>Gorin v. Osborne</u>, 756 F.2d 834 (11th Cir. 1985). There the plaintiff appealed her discharge to the State Personnel Board, which upheld the discharge following an adversarial hearing. The plaintiff appealed to the Cobb County Superior Court, which affirmed the decision. Gorin's appeal to the Georgia Court of Appeals was voluntarily dismissed. Her subsequent section 1983 action was dismissed, based on <u>res judicata</u> and collateral estoppel.

The Eleventh Circuit affirmed the dismissal, noting:

> The *Kremer* decision specifies no minimum level of judicial review as a prerequisite to the preclusivity of a judicial affirmance of state administrative rulings. Indeed, the *Kremer*

>     Court emphasized that "when a complainant has had a full opportunity to present his evidence and exhibits" before the administrative tribunal-as Ms. Gorin clearly did-then even judicial review confined to a determination of whether there was a "rational basis in the record" for the agency decision would constitute a "decision on the merits" and would be entitled to preclusive effect under 28 U.S.C. § 1738.

Gorin, 756 F.2d at 837-38.

Based on Kremer, this case must be dismissed in deference to the circuit court decisions.

DONE this 31st day of March, 1999.

*[signature]*
UNITED STATES DISTRICT JUDGE
U. W. CLEMON